IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JOHN MENDOZA, | ) | CIV. NO. 12-00566 JMS/BMK |
| | ) | CR NO. 08-00303-01 JMS |
| Petitioner, | ) | |
| | ) | ORDER: (1) DISMISSING |
| vs. | ) | PETITIONER'S MOTION UNDER |
| | ) | 28 U.S.C. § 2255 TO VACATE, SET |
| UNITED STATES OF AMERICA, | ) | ASIDE, OR CORRECT SENTENCE |
| | ) | BY A PERSON IN A FEDERAL |
| Respondent. | ) | CUSTODY; AND (2) DENYING A |
| | ) | CERTIFICATE OF |
| _____ | ) | APPEALABILITY |

**ORDER: (1) DISMISSING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN A FEDERAL CUSTODY; AND (2) DENYING A CERTIFICATE OF APPEALABILITY**

## I.  INTRODUCTION

Currently before the court is Petitioner John Mendoza's ("Mendoza") Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion").  Doc. No. 479.[1]  A jury found Mendoza guilty on all twenty-two counts of a Third Superseding Indictment ("TSI") alleging an elaborate mortgage fraud scheme.  Mendoza challenges his conviction on various grounds, including ineffective assistance of counsel.  For the following reasons, the court DENIES Mendoza's § 2255 Motion and DENIES a

---

[1]  All references to Document Numbers refer to those in Crim. No. 08-00303-01 JMS.

certificate of appealability.

## II.  <u>BACKGROUND</u>

### A.    **Procedural Background**

On October 21, 2009, a grand jury in the District of Hawaii returned the TSI against Mendoza and Ira Altwegg.[2]  Doc. No. 258.  The TSI charged Mendoza with twenty-two counts for: conspiracy (one count), mail fraud (two counts), wire fraud (eight counts), making false statements on loan applications to financial institutions (two counts), and money laundering (six counts) in violation of 18 U.S.C. §§ 371, 1341, 1343, 1014, and 1957, and for willfully failing to file federal income tax returns for calendar years 2004, 2005, and 2006 (three counts) in violation of 26 U.S.C. § 7203.

On January 20, 2010, trial began as to Mendoza.  Doc. No. 235.  On February 10, 2010, after a seven-day trial, the jury found Mendoza guilty of all counts.  Doc. No. 343.  The court subsequently sentenced Mendoza to a term of imprisonment of 72 months, restitution of $881,514.98, special monetary assessments totaling $1,875.00, and a term of supervised release of five years.  Doc. No. 406.  Judgment entered on July 30, 2010.  Doc. No. 413.  The Ninth

---

[2]  Prior Indictments also charged Albert Alimoot, Antonio Alcantara, Jr., and Evan Koizumi with various offenses stemming from this mortgage fraud scheme.  All other Defendants pled guilty to the counts against them, and provided testimony on behalf of the United States at Mendoza's trial.

Circuit Court of Appeals subsequently affirmed the judgment.  *See United States v. Mendoza*, No. 10-10375 (9th Cir. Oct. 18, 2011) (memo.), Doc. No. 452.

On October 18, 2012, Mendoza filed his § 2255 Motion asserting, among other things, that his counsel William Domingo ("Domingo") provided ineffective assistance of counsel.  Doc. No. 479.  On October 30, 2012, the court entered an order finding that Mendoza waived his attorney-client privilege as to the issues raised in the § 2255 Motion.  Doc. No. 483.  The government filed an Opposition to the § 2255 Motion on December 26, 2012, Doc. No. 485, and Mendoza filed a Reply on February 4, 2013.  Doc. No. 488.

On February 23, 2013, the court entered an Order Requiring a Status Conference to Discuss Supplemental Briefing and Possible Appointment of Counsel.  Doc. No. 491.  The February 23, 2013 Order explained the need for supplemental briefing on Mendoza's argument that Domingo provided ineffective assistance of counsel by failing to present evidence supporting the theory of defense that Mendoza did not engage in mortgage fraud, and raising the question whether Mendoza would prefer counsel to address the court's questions.  During a March 18, 2013 status conference, Mendoza informed the court that he did not want court-appointed counsel.  *See* Doc. No. 494.  The government filed its Supplemental Memorandum on April 17, 2013, Doc. No. 495, and Mendoza filed

his Supplemental Memorandum on May 21, 2013.  Doc. No. 498.

**B.**     **Factual Background**

This mortgage fraud case stems from transactions involving two

properties owned by Socorro Kovach and Rosemary Dano, respectively.  As

asserted by the government, Mendoza induced these individuals facing foreclosure

to sell their properties by promising them that they could remain in their homes

while at the same time receiving a portion of the proceeds from the transaction.

Mendoza then paid third parties to act as "straw purchasers," *i.e.*, individuals who

are willing to purchase a property without any intent to occupy the property or

exercise any true ownership rights.  Mendoza promised these straw purchasers that

they were participating in an investment strategy where, although they would take

out loans on the properties, they would make no mortgage payments (instead,

Mendoza asserted he would pay the mortgages).  In turn, Mendoza received the

bulk of the loan proceeds, and subsequently had straw purchasers enter into

additional loan agreements to obtain additional equity from these property.  Both

these properties ultimately ended in foreclosure.

The sum result of these transactions was that the lenders were forced

to sell the homes at a loss compared to the loans issued, homeowners lost their

homes, the straw purchasers suffered harm to their credit, and Mendoza obtained

substantial income from obtaining the loan proceeds, for which he failed to file tax returns.  At trial, the alleged co-conspirators -- mortgage brokers Paula Galacgac and Ira Altwegg, and straw purchasers Albert Alimoot and Evan Koizumi, testified against Mendoza after pleading guilty of the charges against them.  As material to the § 2255 Motion, the evidence presented by the government regarding these transactions is as follows:

### 1. *The Mokapu Property*

In 1987, Socorro Kovach and her husband purchased real property located at 1309 Mokapu Boulevard, Kailua, Hawaii (the "Mokapu Property").  Doc. No. 424, Trial Tr. at 49.  In 2003, the Kovaches separated and Socorro Kovach began having trouble making her payments, which ultimately resulted in Kovach's mortgage lender, Beneficial of Hawaii, Inc., foreclosing on the Mokapu Property.  *Id.* at 13-14, 49-50.  At the subsequent auction, Beneficial was the high bidder.  *Id.* at 13-14.

In October 2003, Beneficial began taking steps to sell the property, in which Kovach and her son, Alvin Pineda, were still living.  *Id.*  Kovach therefore sought help from Paula Galacgac, a mortgage broker.  Galacgac testified that she introduced Kovach to Mendoza, who said he was a pastor for a Pentecostal church and helped people get out of financial debt.  *Id.* at 126-28.  Mendoza proposed that

he would (1) purchase the Mokapu Property from Beneficial for $400,000 through a third party, (2) pay the mortgage and allow Kovach to continue to live on the property, and (3) help Kovach with her bills and start a business with her so that she would be financially set for the rest of her life.  *Id.* at 128-29.

As for the third party who would actually purchase the Mokapu Property, Galacgac introduced Mendoza to Albert Alimoot, who was interested in purchasing a home.  *Id.* at 130.  Alimoot, a born again Christian, believed that Mendoza was a "Godly man" who helped people save their homes.  Doc. No. 425, Trial Tr. at 36-37, 42.  Alimoot testified that Mendoza told him that Alimoot could be an investor on the Mokapu Property by applying for the mortgage loan and taking title in his name.  *Id.* at 36-39.  Mendoza explained that he would hold the loan proceeds in his account, from which he would make monthly payments on the mortgage, and that Alimoot would receive $5,000 for signing the loan documents. *Id.* at 36.  Alimoot understood that the Kovaches would eventually be able to buy back their home, and Alimoot would benefit by improving his credit score and helping a family save their home from foreclosure.  *Id.*

Before having Alimoot qualify for a loan, Mendoza opened an escrow account for the sale of the Mokapu Property identifying the buyer as "John Mendoza and/or his assignee."  Doc. No. 424, Trial Tr. at 133-34; Gov't Trial Ex.

102.  On March 23, 2004, Mendoza and Alimoot signed an agreement purporting to have Alimoot sell to "Storehouse Financial Corporation or assignee" (one of Mendoza's companies) the Mokapu Property for $400,000.  Gov't Trial Ex. 103. In other words, this agreement purported to transfer the Mokapu Property from Alimoot to Storehouse Financial, while Alimoot remained obligated on the loan. According to Alimoot, he did not read this document in depth, and Mendoza represented to him that this agreement simply ensured that Mendoza "had control over the property."  Doc. No. 425, Trial Tr. at 53.

Galacgac determined that Alimoot was not qualified for the proposed mortgage loan, and in response Mendoza instructed her to find another loan program.  Doc. No. 424, Trial Tr. at 132-33.  Galacgac therefore proposed a stated income loan offering one hundred percent financing and requiring owner occupancy.  *Id.* at 133.  Although Galacgac and Mendoza knew that Alimoot would not be living in the Mokapu Property, Mendoza told her to "do what it takes" to qualify Alimoot for the loan.  *Id.*  As a result, Alimoot, with Galacgac's assistance, submitted a Uniform Residential Loan Application to Mortgage Ability for two loans to cover the $400,000 purchase price -- one for $320,000, and the second for $80,000.  *Id.* at 135-37; Gov't Trial Exs. 104, 105.  Both loans asserted that the Mokapu Property would be Alimoot's primary residence.

7

On April 8, 2004, Alimoot's loans were funded by wire transfers in the amounts of $318,090.27 and $79,187.88.  Gov't Trial Exs. 2, 2A, 3, 3A, 4; Doc. No. 429, Trial Tr. at 26-27, 30-31.  Upon closing, the Kovaches were issued a check for $49,063.38 for their equity in the property.  Gov't Trial Exs. 116, 116A. Mendoza drove Kovach to her credit union, where she deposited the check and had issued (1) a check to Mendoza for $28,300, (2) a check to Alimoot for $5,000, and (3) a check to Marcella Skaggs for $5,100 to pay off a debt Kovach owed Skaggs. Gov't Trial Ex. 116B.  Mendoza told Kovach that he would invest the $28,300 for Kovach.  Doc. No. 424, Trial Tr. at 57.[3]

The next month (May 2004), Mendoza asked Galacgac to refinance Alimoot's mortgage loans to obtain the remaining equity on the Mokapu Property so that Mendoza could improve the property and help Kovach travel to the Philippines and work on her business.  Doc. No. 424, Trial Tr. at 140.  On July 15, 2004, Galacgac and Alimoot signed a loan application for $498,750 (*i.e.*, $98,750 more than the previous loans).  Gov't Trial Ex. 126; Doc. No. 424, Trial Tr. at 141-43.  The loan falsely stated that the Mokapu Property would be Alimoot's primary residence, and also falsely inflated his monthly income from $7,100 to $11,000.

---

[3]  Kovach testified that after church members questioned this transaction, Kovach complained to Mendoza, who promised Kovach $10,000.  Doc. No. 424, Trial Tr. at 58-59. Instead, Mendoza gave Kovach $3,000 and a ride to the airport (Kovach was planning to spend time in the Philippines).  *Id.* at 59.

Gov't Trial Ex. 126; Doc. No. 424, Trial Tr. at 141-43.

When the loan funded, Alimoot received two checks for $36,558.20 and $34,955.71 (issued on June 5, 2004, and August 23, 2004, respectively), representing the equity obtained through refinancing.  Gov't Trial Exs. 26, 27, Doc. No. 425, Trial Tr. at 71.  As he did with Kovach, Mendoza drove Alimoot to a bank, where Alimoot signed the checks over to Grace International, another one of Mendoza's companies.  Doc. No. 425, Trial Tr. at 45-46.

Alimoot testified that Mendoza made seventeen payments on this mortgage loan (which called for monthly payments of $3,398.97), *id.* at 87, Gov't Trial Ex. 129, and evidence presented to the jury suggests that Mendoza made at least one payment totaling $2,772.56 on Alimoot's mortgage loan funded on April 8, 2004.  Gov't Trial Exs. 123-123A.  Alimoot nonetheless testified that at some point, he began receiving calls from the lender that he was late on his mortgage payments.  *Id.* at 46.  When Alimoot confronted Mendoza, Mendoza promised to have Alvin Pineda, Kovach's son, replace Alimoot on the loans.  *Id.* at 47.  When Mendoza failed to take steps for Pineda to take out a loan, Alimoot obtained assistance from Galacgac, who prepared a loan application falsely stating Pineda's income.  *Id.* at 47-48; Doc. No. 424, Trial Tr. at 149-50.  In October 2005, Pineda's loan in the amount of $680,000 was approved.  Doc. No. 424, Trial Tr. at 149-50.

When Mendoza learned of this transaction, his company Storehouse Financial sued Alimoot, Pineda, and Galacgac.  The basis of the lawsuit was the agreement that Mendoza had Alimoot sign prior to the first loan transaction, purporting to transfer Alimoot's interest in the Mokapu Property to Storehouse Financial.  Mendoza's civil action claimed that Storehouse Financial was entitled to title to the Mokapu Property, the proceeds received from the sale to Pineda, and damages.  Doc. No. 424, Trial Tr. at 153-55; Gov't Trial Ex. 1H (Complaint).

Pineda was unable to pay the mortgage loan and was ultimately evicted from the Mokapu Property.  Doc. No. 424, Trial Tr. at 28-29.  In January 2010, Litton Loan Servicing sold the property for $446,500.  *Id.* at 30-31.

The financial result of these transactions is that Kovach lost her equity in the Mokapu Property (approximately $190,599),[4] and Litton Loan Servicing sold the Mokapu Property at a $233,500 loss (Pineda's $680,000 loan minus the $446,500 sale price).[5]  In comparison, Mendoza obtained $28,300 from Alimoot's first loan, and $71,415 from Alimoot's second loan.

---

[4] At sentencing, the court factored in the Kovaches' ability to stay in the property to award restitution in the amount of $158,613.

[5] Given that Mendoza was not involved in the Alimoot/Pineda transaction, at sentencing the court determined that Mendoza should not be held responsible for this loss because it was not reasonably foreseeable to him.

## 2.    *The 16th Avenue Property*

In January 2005, Rosemary Dano and her daughter, Tricia, sought to refinance the mortgage on their home at 1434 16th Avenue in Kaimuki, Hawaii (the "16th Avenue Property") to avoid foreclosure.  Doc. No. 424, Trial Tr. at 155-56.  The Danos met with Antonio Alcantara, Jr. and Galacgac, who introduced the Danos to Mendoza.  *Id.* at 156.  Mendoza represented that he invested with Christian families who needed help.  Doc. No. 490-2, Tricia Dano Depo. Tr. at 12-13.

It was Tricia Dano's understanding that the Danos and Mendoza would take out a loan together, the Danos would pay rent to Mendoza to improve their credit, and Mendoza would make mortgage payments.  *Id.* at 10-13.  As a result, on February 16, 2005, the Danos signed a contract to sell the 16th Avenue Property to "Grace International Corporation and/or Assignee(s)" for $710,000. Gov't Trial Ex. 143.

In the meantime, Galacgac introduced Mendoza to Evan Koizumi, a potential investor in this transaction.  Doc. No. 425, Trial Tr. at 106.  Koizumi understood that Mendoza was a "church man" and/or "holy man" who made mortgage investments.  *Id.* at 106-07.  Mendoza offered that Koizumi could take over the mortgage for one or two years of someone who is in danger of losing their

11

home, and then sell it back to the family when they got back on their feet.  *Id.* at

108.  Koizumi would receive $5,000 for allowing Mendoza to use his name on the

loan, and Mendoza would make payments on the mortgage.  *Id.* at 108-10.

Mendoza instructed Galacgac that the deal using Koizumi on the 16th

Avenue Property was to be "structured the same way as with Alimoot," and to

make sure that no down payment was needed.  Doc. No. 424, Trial Tr. at 158-59.

Mendoza also instructed Galacgac that even though the loan application would

need to state that Koizumi would live at the 16th Avenue Property, the Danos

would continue to live there.  *Id.* at 159.  As a result, Galacgac prepared Koizumi's

loan application for the full $710,000 purchase price, overstating his income and

falsely stating that he would occupy the house.  *Id.* at 149-50, Gov't Trial Ex. 149.

The loan was approved, and on April 4, 2005, Finance America made

a wire transfer of $716,055.51 to Hawaii Escrow & Title, Inc.  Gov't Trial Ex. 5.

After paying off the Danos' mortgage and costs, the Danos received $100,000 and

Grace International received $140,970.18.[6]  Gov't Trial Ex. 157.  Mendoza

explained that Grace International was receiving this money so that he could

maintain the mortgage payments and invest the Danos' funds for them.  Doc. No.

---

[6]  Some of the proceeds were also used to pay a $9,022.36 lien against Koizumi for
unpaid child support.  Gov't Trial Ex. 157; Doc No. 425, Trial Tr. at 159-160.  As a result,
Mendoza did not pay Koizumi the promised $5,000.  Doc. No. 425, Trial Tr. at 113.

424, Trial Tr. at 164.  Koizumi testified that Mendoza made monthly payments of

$5,140.61 for "over a year" on the mortgage loan.  Doc. No. 425, Trial Tr. at 141.

Several months after the transaction, Mendoza asked Koizumi to sign

additional loan documents to sell the 16th Avenue Property back to the Danos for

$1,006,000.  Gov't Trial Ex. 166; Doc. No. 425, Trial Tr. at 115.  Koizumi felt

uncomfortable with the transaction given that it was unclear how the Danos would

be able to afford this additional amount when they could not afford their original

mortgage.  Doc. No. 425, Trial Tr. at 115-16.  Around this same time, Koizumi

began receiving calls from the lender seeking late payments.  *Id.* at 116.  When

Koizumi confronted Mendoza, Mendoza stated that refinancing the mortgage loan

would help with the payments.  *Id.*

When the Danos did not qualify for a mortgage loan, *see* Doc. No.

428, Trial Tr. at 17-19, Mendoza approached Laura Cristo to purchase the 16th

Avenue Property.  Mendoza knew Cristo from patronizing her restaurant, and told

Cristo that he was a minister who did outreach for the poor and also made his

money in the foreclosure business.  *Id.* at 115-16.  Mendoza told Cristo that she

could sign "legal" documents which would allow the Danos to keep their house.

*Id.* at 118-19.  Cristo would receive $5,000, and then in "about six months" the

Danos would be able to get the property back in their name.  *Id.*

13

Cristo agreed to this arrangement and Koizumi, Mendoza's company Grace International, and Cristo proceeded to enter into a series of transactions for Cristo to purchase the 16th Avenue Property.  First, on August 2, 2005, Cristo agreed to purchase the 16th Avenue Property from Grace International for $937,500.  Gov't Trial Ex. 171.  Second, on November 17, 2005, Grace International agreed to purchase the property from Koizumi for $750,577.83.  Gov't Trial Ex. 172.  On December 13, 2005, Grace International and Cristo signed an agreement making Cristo the assignee of Grace International's rights to purchase the 16th Avenue Property from Koizumi, and providing that Grace International would pay Cristo $5,000.  Gov't Trial Ex. 176.  The agreement further provided that Cristo would take title and sign a deed to Grace International, which would make the mortgage payments.  *Id.*

Mendoza worked with mortgage broker Ira Altwegg to obtain a loan for Cristo.  *Id.* at 20-21.  After Altwegg objected that the proposed stated income loan would not be approved on an investment property and that Cristo's income was insufficient, Mendoza instructed Altwegg to do an owner-occupied transaction and to increase Cristo's income.  *Id.* at 23-24, 46.  On December 19, 2005, Cristo signed two loan applications for $750,000 and $187,500 respectively, which both falsely stated her income and that she would occupy the property as her primary

residence.  *Id.* at 45-46; Gov't Trial Exs. 178-79.

On December 21, 2005, the loans funded via two wire transfers of $753,367.57 and $186,626.03.  Gov't Trial Exs. 6-7.  After paying off Koizumi's mortgage, Grace International received $140,501.18.  Gov't Trial Ex. 29.  Mendoza then purchased cashier's checks in the amounts of $8,000 for the Danos and $13,400 for Cristo.  Gov't Trial Exs. 29A-29B.  Mendoza subsequently paid a total of $20,634.04 on the mortgage loan.  Gov't Trial Ex. 194.[7]

In April 2006, Mendoza convinced Cristo to refinance the property.  To that end, Altwegg prepared two loan applications for a total of $1,050,000.  Gov't Trial Exs. 200-201.  Like the previous applications, they overstated Cristo's income and falsely represented that she would occupy the home.  *Id.*  The applications further falsely asserted that Cristo had $123,000 in a First Hawaiian Bank account.  *Id.*  Option One approved the loans, and on May 8, 2006, wire transfers were made in the amounts of $210,465.50 and $846,825.81.  Gov't Trial Exs. 8-9.  As a result of this refinancing, Grace International received $51,237.67.  Gov't Trial Exs. 210-11.

---

[7] Government's Trial Exhibit 194 includes Western Union checks sent to Fremont Investment & Loan, and identifies the sender as "Cristo Dano Grace International."  Although the checks do not identify that the monies came from Mendoza, Cristo testified that Mendoza showed her a few of these checks to verify that he was paying the mortgage. Doc. No. 428, Trial Tr. at 154.

After this refinancing (the third on the 16th Avenue Property in thirteen months), Cristo began receiving calls advising that her mortgage payments were late.  Doc. No. 428, Trial Tr. at 134.  Cristo left messages on Mendoza's answering machine, and in response Cristo received a June 26, 2006 letter from attorney James Sattler, who stated that he represented Grace International.  Gov't Trial Ex. 213.  Sattler's letter referenced one of Cristo's voice mail messages to Mendoza in which she stated that she would not release the 16th Avenue Property to Mendoza.  Sattler asserted that Cristo misunderstood her legal rights given the December 13, 2005 agreement she signed with Grace International.  Sattler further represented that although Mendoza had obtained cashier's checks to make the mortgage payments, Mendoza would not deliver them based on Sattler's advice. *Id.*  According to Sattler, Grace International would make no more payments unless Cristo complied with her obligations, and that her personal credit was at risk.  *Id.*

On April 9, 2007, Sattler contacted Cristo once more to notify her that Litton Loan Servicing was threatening foreclosure, and to seek her authorization for Mendoza to speak with Litton Loan Servicing.  Gov't Trial Ex. 213A.  Although Cristo provided her authorization, Mendoza made no payments.  *See* Gov't Trial Ex. 213B.  As a result, Option One foreclosed on the 16th Avenue

16

Property, sustaining a loss of $210,000 by writing off the second of Cristo's loans on November 21, 2007.  Doc. No. 429, Trial Tr. at 139-40.

The financial result of these transactions is that the Danos lost their equity in the 16th Avenue Property (approximately $533,190.83),[8] Option One (now Sand Canyon Corporation) suffered a $210,000 loss by writing off Cristo's loan for this amount, while Mendoza and his related companies received $140,970.18 from the transaction with Koizumi, $140,501.18 from Cristo's first loan transaction, and $51,237.67 from Cristo's second transaction.

## III.  STANDARD OF REVIEW

The court's review of Mendoza's Motion is governed by 28 U.S.C. § 2255(a):

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

> A court should hold an evidentiary hearing on a § 2255 motion

---

[8]   This amount factors in the amounts the Danos received from Mendoza.  At sentencing, the court factored in the mortgage payments on the 16th Avenue Property along with the Danos' ability to stay in the property to award restitution in the amount of $512,901.98.

"unless the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  "In determining whether a hearing and findings of fact and conclusions of law are required, '[t]he standard essentially is whether the movant has made specific factual allegations that, if true, state a claim on which relief could be granted.'"  *United States v. Withers*, 638 F.3d 1055, 1062 (9th Cir. 2011) (quoting *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984)).  "Thus, the district court's decision that [the petitioner's] ineffective assistance claim did not warrant an evidentiary hearing [is] correct if his allegations, when viewed against the record, do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal."  *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (citing *Schaflander*, 743 F.2d at 717) (quotations omitted).  Conclusory statements in a § 2255 motion are insufficient to require a hearing.  *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993).  After careful consideration of Mendoza's factual allegations and the record as a whole, the court concludes that an evidentiary hearing is not required -- Mendoza makes no specific factual allegations that state a claim upon which relief can be granted.

///

///

# IV. <u>DISCUSSION</u>

In a rambling, stream-of-consciousness approach, Mendoza strings together various facts that he believes should have been presented at trial, alleged misstatements and/or falsified exhibits presented by the government, and other grievances about his trial.  Viewing these claims liberally, they appear to fall into two general categories: (1) ineffective assistance of counsel; and (2) prosecutorial misconduct.  The court addresses these claims in turn.

## A. Ineffective Assistance of Counsel

### 1. *Legal Standard for Ineffective Assistance of Counsel Claims*

To prevail on an ineffective assistance claim, a § 2255 movant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

As to the first prong, counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690; *see Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990).  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.  The court "'will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound trial strategy."  *Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009) (quoting *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001)).  In other words, "[b]ecause advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."  *Id.* (quoting *Strickland*, 466 U.S. at 681).

Thus, a § 2255 movant "bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Id.* (quoting *Murtishaw*, 255 F.3d at 939).  In arguing that counsel is deficient, a § 2255 movant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Id.* (quoting *Strickland*, 466 U.S. at 690).  "The court must then consider those acts or omissions against 'prevailing professional norms.'"  *Id.* at 1092 (quoting *Strickland*, 466 U.S. at 690).

Even upon showing that counsel's performance is deficient, the

§ 2255 movant must also show that the deficiency was prejudicial to the petitioner's defense. *Strickland*, 466 U.S. at 692. Stated differently, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "To determine whether counsel's errors prejudiced the outcome of the trial, [the court] must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Cannedy v. Adams*, 706 F.3d 1148, 1163 (9th Cir. 2013) (quoting *Thomas v. Chappell*, 678 F.3d 1086, 1102 (9th Cir. 2012)). "What matters is whether a competent lawyer would have been able to introduce the evidence, in some form, at trial." *Id.* Thus, "a failure to introduce evidence that is clearly inadmissible cannot be prejudicial, because there is no chance that the jury ever would have heard that evidence." *Id.*

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. *Strickland*, 466 U.S. at 697. In other words, any deficiency that does not result in prejudice necessarily fails.

### 2. *Application*

The charges against Mendoza put into context his arguments that Domingo provided ineffective assistance of counsel. All twenty-two counts of the

TSI were directed to an alleged scheme by Mendoza and his co-conspirators to defraud lender/financial institutions -- the counts for conspiracy, mail fraud, wire fraud, making false statements on loan applications to financial institutions, and money laundering were all based on allegations that Mendoza obtained loan proceeds from financial institutions through false loan applications, and the counts for willfully failing to file federal income tax returns were based on his failure to report income from these transactions.  Thus, although the homeowners provided testimony regarding their interactions with Mendoza, any alleged harm to the homeowners was not a focus of the trial and not necessary to the charges against Mendoza.  That is, the government was required to prove a fraud against financial institutions (or, as to the tax counts, the government), and not the homeowners.

Domingo explains in his Declaration that after reviewing all of the government's documents and meeting with Mendoza, they agreed on a theory of defense that the loan brokers fraudulently obtained loans for the straw buyers without Mendoza's knowledge.  Doc. No. 485-1, Domingo Decl. ¶ 11.  At trial, Domingo attempted to bolster this theory through eliciting testimony regarding (1) Mendoza's payments on behalf of the Kovach and Dano families, and (2) the knowledge and sophistication of the mortgage brokers and their ability to structure the transactions without Mendoza's input.  *Id.*

Mendoza does not dispute that Domingo's theory of defense was an appropriate trial strategy.  Rather, Mendoza asserts that Domingo failed to take reasonable steps in establishing this theory by presenting all of the facts supporting this theory.  Indeed, Mendoza spends much of his § 2255 Motion rehashing the intricacies of these transactions to show that he was simply trying to help these families (even though such contention is secondary to the government's case that Mendoza defrauded financial institutions).

For example, Mendoza asserts that for the Mokapu Property transaction, the parties' intent was for the property to be used for various charitable endeavors and that Socorro Kovach never had any intention of continuing to live in the home.  Doc. No. 479, Mot. at 3, 5-6.  Mendoza further asserts that he provided the Kovach family many benefits, including: (1) getting Socorro Kovach's finances in line by paying off her gambling debt and providing money for her to move to the Philippines, *id.* at 3; (2) ensuring that Kovach received the equity in the Mokapu Property that she would have lost had Beneficial evicted her, Doc. No. 488, Reply at 3-4; (3) providing counseling/mediation services to help repair Socorro Kovach and Alvin Pineda's relationship, Doc. No. 479, Mot. at 4-7; and (4) giving Alvin Pineda housing advice, allowing him to stay at the Mokapu Property for $1,000 monthly rent, and proposing business opportunities.  *Id.* at 6-7.

23

Mendoza contends that his company, Storehouse Financial, had a valid contract to purchase and sell the Mokapu Property from Alimoot, and that Mendoza structured the transaction to include Storehouse Financial to protect Kovach and/or Pineda from having Alimoot sell the property from under them. *Id.* at 8. According to Mendoza, he never told Galacgac to falsify evidence, *id.* at 7, 9, and he made all mortgage loan payments until he learned that Galacgac, Alimoot, and Pineda had gone behind his back to impermissibly take out the remaining equity in the property through the sale from Alimoot to Pineda. *Id.* at 8-9.

As to the 16th Avenue Property, Mendoza asserts that Domingo should have explained that this transaction differed from the Mokapu Property because the Danos planned to stay in the property. *Id.* at 12. Mendoza asserts that the Danos received valuable consideration for entering into this transaction, including (1) the ability to stay in the home without the threat of foreclosure while Mendoza paid the mortgage; (2) $100,000 and additional monies provided by Mendoza; and (3) investment and business opportunities (including a lunchwagon business). *Id.* at 12, 15. According to Mendoza, even when the Danos moved to Las Vegas (despite Mendoza's pleas to stay), Mendoza continued to provide them assistance in Las Vegas and continued to pay the mortgage on the 16th Avenue Property. *Id.* at 16-17. Mendoza asserts that he stopped paying the mortgage on

24

the advice of his then-counsel only when Cristo refused to fulfill her obligations to the contract she signed. *Id.* at 17.

According to Mendoza, Domingo could have called witnesses to verify Mendoza's version of events, admitted into evidence the mortgage payments and the contracts regarding the transactions, and presented expert testimony to explain the transactions. *Id.* at 10-11. Based on the following, the court finds that Mendoza has failed to carry his burden of establishing that Domingo rendered ineffective assistance, or that any of Domingo's decisions caused any prejudice.[9]

     a.     *Mendoza offers no explanation as to how Domingo could have admitted into evidence certain facts where Mendoza decided not to testify*

Although Mendoza spends the bulk of his § 2255 Motion reciting his version of events, he identifies only a few specific actions he asserts Domingo should have taken in presenting this version at trial. *See Strickland*, 466 U.S. at 690 (stating that a claimant must identify particular acts or omissions that are not the result of reasonable professional judgment). And because Mendoza chose not to testify, the court cannot discern how Mendoza contends Domingo could have presented Mendoza's version of events. *See Cannedy*, 706 F.3d at 1163

---

[9] Beyond arguing that Domingo failed to present Mendoza's version of events to the jury, Mendoza also appears to argue that Domingo failed to secure Mendoza an interview with the media. Doc. No. 479, Mot. at 19. It should go without saying that the failure to obtain press coverage does not amount to ineffective assistance of counsel.

25

(explaining that to establish prejudice, the evidence at issue must be both admissible and potentially determinative of the trial's outcome).

For example, Mendoza would need to testify to explain (1) that he assisted these families for the sole purposes of having them avoid foreclosure and become financially stable; (2) what benefits he provided to the Kovach and Dano families (to the extent such facts did not come out during their testimony); (3) his plans for using the Mokapu Property for charitable purposes; (4) why he structured each loan transaction to involve the various agreements between the straw purchaser, Mendoza, and/or one of his companies; (5) that he did not instruct Galacgac to falsify the loan documents; and (6) his reasons for why he stopped paying the mortgages on the properties. Without Mendoza's testimony, Domingo was hard-pressed for a means to present these facts, and Mendoza does not suggest that Domingo should have taken any particular steps to present them. Given that Mendoza fails to identify what actions Domingo should have taken to present these facts or explain how these facts could be presented in an admissible form, Mendoza has failed to show either deficient assistance or prejudice.

And to the extent Mendoza's assertion of these facts in his § 2255 Motion could be construed as asserting that Domingo provided ineffective assistance in advising Mendoza of his right to testify, such claim fails. Domingo

26

outlined the benefits and risks of testifying to Mendoza, who ultimately chose not to exercise this right.  *See Lema v. United States*, 987 F.2d 48, 52 (1st Cir. 1993) ("[L]egal advice concerning exercise of the right to testify infringes no right, but simply discharges defense counsel's ethical responsibility to the accused." (citations omitted)); *Cf. United States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990) ("Neither the prosecution nor the court was given any reason to think the defendant desired to testify.  In such circumstances, [t]o hold that a defendant may abide by his lawyer's advice and not take the stand and then invalidate the trial because he so acted is not fair to the government.") (internal quotation marks and citation omitted).  Domingo advised Mendoza that although testifying would allow him to explain his role in the transactions, Mendoza would be cross examined regarding how he expected the Kovach and Dano families to repurchase their homes at the higher mortgage amounts and how he spent the monies he received from the transactions.  Doc. No. 485-1, Domingo Decl. ¶ 9.  Domingo further explained that Mendoza's inability to explain and document what he did with the loan proceeds would hurt his credibility, and that a blanket denial was not plausible given the sophistication of the transactions.  *Id.* ¶ 12.  At trial, Mendoza confirmed to the court that through his discussions with Domingo he did not wish to testify. Doc. No. 431, Trial Tr. at 86.

Domingo's advice to Mendoza whether to testify "is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." *See Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002) (internal quotations omitted).  The court therefore rejects the § 2255 Motion to the extent it (1) suggests that Domingo should have presented facts that only Mendoza could have offered through testifying; or (2) attacks Domingo's advice to Mendoza regarding whether to testify.

　　　　b.　　*Domingo's alleged failure to call fact witnesses*

Mendoza asserts that Domingo should have presented Mendoza's version of the facts through witness testimony including: (1) Skaggs to testify regarding the fact that Socorro Kovach owed her money and she considered placing a lien on the Mokapu Property; (2) the pastor from the Shield of Faith ministry and the Assistant Pastor from Hope Chapel to testify regarding Socorro's decision to move to the Philippines, the problems between Kovach and Pineda, and the proposed charitable uses of the Mokapu Property; (3) Cynthia Thielen to testify regarding Mendoza's proposed charitable uses of the Mokapu Property; and (4) Alvin Pineda to testify regarding his dealings with Mendoza and his transaction

with Galacgac and Alimoot.[10]   Contrary to Mendoza's argument, whether to call

these witnesses at trial was a reasonable strategy deserving broad deference.  *See*

*Raley v. Ylst*, 470 F.3d 792, 801 (9th Cir. 2006) (determining that decision not a

call a witness was a reasonable trial strategy).

As an initial matter, given Mendoza's decision not to testify, Mendoza

offers no explanation as to how Domingo could have established a foundation for

witness testimony regarding what Mendoza planned to do with the Mokapu

Property, or his interactions with the Kovach and Dano families.  And anything

Mendoza told these witnesses would likely be hearsay and inadmissible.  *See*

*Cannedy*, 706 F.3d at 1163 ("[A] failure to introduce evidence that is clearly

inadmissible cannot be prejudicial, because there is no chance that the jury ever

would have heard that evidence.").

Further, some of this testimony would have been redundant and/or

cumulative of other testimony already presented at trial.  For example, Kovach

---

[10]   In his Reply, Mendoza raises an additional argument that Domingo should have called as a witness Vance Inouye, who had relevant information regarding the 16th Avenue Property transactions.  Doc. No. 488, Reply at 9.  The court does not address arguments raised for the first time in a reply.  *See* Local Rule 7.4 ("Any argument raised for the first time in the reply shall be disregarded."); *see also United States v. Berry*, 624 F.3d 1031, 1039 n.7 (9th Cir. 2010) (declining to address an argument raised for the first time in a reply brief in a § 2255 motion); *Belgrade v. Montana*, 123 F.3d 1210, 1216 (9th Cir. 1997) (declining to consider claims not raised in the original habeas petition to the district court).  And in any event, Mendoza fails to carry his burden by explaining what testimony this witness would have provided and how such testimony could have affected the result at trial.

testified that she paid off her debt to Skaggs using money provided by Mendoza.

As a result, Skaggs' testimony to this same point would have added little to

Mendoza's case.  Galacgac and Alimoot also testified regarding their mortgage

transaction with Pineda such that Domingo's decision not to present Pineda's

testimony is not unreasonable.  *See Clabourne v. Lewis*, 64 F.3d 1373, 1382 (9th

Cir. 1995) (holding that counsel's failure to present redundant testimony cannot be

ineffective assistance (citing *United States v. Schaflander*, 743 F.2d 714, 718 (9th

Cir. 1984) (failure to present cumulative testimony does not amount to ineffective

assistance)).

Another consideration is that the testimony by these witnesses (in

particular, the pastors and Pineda) could have done more harm than good by

highlighting on cross-examination Mendoza's use of religion to ingratiate himself

with the families he was allegedly victimizing.  Determining whether to call a

witness based on these considerations falls well within the purview of sound trial

strategy.  *See Brodit v. Cambra*, 350 F.3d 985, 994 n.3 (9th Cir. 2003) (holding

state court reasonably concluded trial attorney provided effective assistance where

attorney declined to present evidence favorable to defense out of concern it would

open the door to unfavorable evidence).

Finally, even if these witnesses were called, there is no reasonable

probability that the result of trial would be different given the strength of the evidence regarding Mendoza's convictions.

The court therefore DENIES Mendoza's § 2255 Motion to the extent he asserts that Domingo provided ineffective assistance of counsel by failing to call these witnesses.

### c.    *Domingo's alleged failure to call expert witnesses*

Mendoza argues that Domingo provided ineffective assistance of counsel by failing to call expert witnesses to explain the mortgage transactions. Mendoza's argument is meritless.

In preparing for trial, Domingo consulted with two experts regarding the mortgage transactions.  Doc. No. 485-1, Domingo Decl. ¶ 13.  Domingo decided not to present either of their testimony -- although they could explain the structure of the transactions, Domingo was concerned that they might admit that the use of assignees was not common in residential transactions and that the misrepresentations on the loan applications made the transactions fraudulent.  *Id.* ¶ 14.  Domingo was also concerned that they might testify that Mendoza's plan had no real chance of success where the amount of the successive mortgages made it difficult for the original homeowners to buy back their homes.  *Id.*

Given these considerations, Domingo's decision not to call expert

witnesses was a reasonable (and indeed, prudent) strategic decision.  *See Raley*, 470 F.3d at 801.  Further, given that these experts would have likely provided testimony harmful to Mendoza's defense, Mendoza has failed to establish any prejudice.

In opposition, Mendoza argues that these experts might have provided more favorable testimony had Domingo explained to the experts Mendoza's theory of defense, rather than focusing on the government's evidence.  *See* Doc. No. 488, Reply at 11-12.  This argument is wrong in both fact and logic.  Contrary to Mendoza's argument, Domingo explained the theory of defense to the experts.  *See* Doc. No. 485-3, Gov't Ex. B.  Further, it should go without saying that Domingo needed to articulate the government's case so that the experts could provide opinions taking into account all theories and facts, and to prevent any surprise during cross examination by the government.

The court therefore DENIES Mendoza's § 2255 Motion to the extent it asserts that Domingo provided ineffective assistance of counsel by failing to present expert testimony.

d.    *Domingo's alleged failure to present documents regarding the mortgage transactions and loans*

Mendoza asserts that Domingo should have presented into evidence (1) Mendoza's mortgage payments on the properties; (2) two checks he received

32

from Rosemary Dano in the amount of $5,278.52 each; and (3) the contracts

between his companies and the straw purchasers.[11]  Based on the following, the

court finds that Mendoza has failed to establish that Domingo's strategic decisions

regarding these documents fell below prevailing professional norms, or that there is

a reasonable possibility, had this evidence been admitted, that the result of the

proceeding would be different.

## I.    Mortgage payments

Construing his arguments liberally, Mendoza asserts that Domingo

should have presented evidence at trial that Mendoza paid the mortgages on both

properties, and stopped making payments (1) as to the Mokapu Property only after

learning that Alvin Pineda, Albert Alimoot, and Paula Galacgac had entered into a

transaction without Mendoza whereby Alimoot sold the Mokapu Property to

Pineda; and (2) as to the 16th Avenue Property only after Laura Cristo refused to

fulfill her obligations pursuant to an agreement she signed with Grace

---

[11]  Mendoza asserts that these documents were in a black briefcase, which was seized upon his arrest.  Doc. No. 479, Mot. at 19.  Mendoza contends that Domingo "failed to secure a receipt for the black briefcase," and that the government violated his due process rights by failing to provide a receipt or return the briefcase in a timely manner.  *Id.*  In earlier papers, however, Mendoza admitted that Domingo received the briefcase prior to trial.  *See* Doc. No. 464, at 2.  As a result, the court construes Mendoza's argument regarding the black briefcase as asserting that Domingo failed to admit into evidence these documents.  *See also* Doc. No. 488, Reply at 7 (outlining the documents in the briefcase which Mendoza asserts should have been presented at trial).

International.  Mendoza asserts that evidence of the mortgage payments would have supported his theory of defense that he did not engage in mortgage fraud (and instead attempted to legitimately aid the Kovach and Dano families), and would have undermined the government's theory that he knowingly defrauded financial institutions.

Through supplemental briefing,[12] the parties have brought Mendoza's argument into focus.  At trial, the following evidence of Mendoza's mortgage payments was presented:

• Mendoza made two payments of $2,001.62 and $770.94 on Alimoot's first mortgage loan on the Mokapu property, Gov't Trial Exs. 123-123A;

• Alimoot testified that Mendoza made seventeen payments on his second mortgage loan on the Mokapu property, which called for monthly payments of $3,398.97, Doc. No. 425, Trial Tr. at 87, Gov't Trial Ex. 129;

• Koizumi testified that Mendoza made monthly payments of $5,140.61 for "over a year" on his mortgage loan on the 16th Avenue property,  Doc. No. 425, Trial Tr. at 141; and

_____

[12]   The court limited supplemental briefing to the issue of "whether Domingo provided ineffective assistance of counsel by failing to present evidence of Mendoza's mortgage payments," and warned that "discussion of any of the other issues raised in Mendoza's § 2255 Motion will not be entertained at this time."  Doc. No. 491, Feb. 22, 2013 Order at 5.  The court therefore will not consider unrelated arguments raised in Mendoza's supplemental briefing.  *See Belgrade*, 123 F.3d at 1216.

- Mendoza made payments totaling $20,634.04 on Cristo's mortgage loan on the 16th Avenue Property, Gov't Trial Ex. 194.

The only additional evidence regarding mortgage payments that was not presented at trial were Western Union checks (there was no evidence of direct payments to the lenders from any of Mendoza's accounts). *See* Doc. No. 495-2, Gov't Ex. A. Thus, Mendoza's argument boils down to the assertion that Domingo should have presented the Western Union checks and/or outlined each payment Mendoza made on each mortgage. The court rejects that Domingo's strategic decision not to present this evidence in a particular manner was deficient, much less caused any prejudice.

As an initial matter, Mendoza offers no suggestion as to how Domingo could have presented these Western Union checks into evidence where Mendoza chose not to testify.[13] Mendoza was in the best position to explain that he purchased each Western Union check and made the payments on the mortgage loans. Yet as explained above, testifying would have opened Mendoza to cross-examination, and Domingo's advice to Mendoza whether to testify (as well as Mendoza's ultimate decision not to take the stand) cannot be challenged. *See*

---

[13] Domingo also believed that the Western Union checks seemed "unusual," and that he would not be able to explain why they were purchased without calling Mendoza as a witness. *See* Doc. No. 495-1, Domingo Suppl. Decl. ¶ 7. The court does not second-guess this strategic decision. *See Matylinsky*, 577 F.3d at 1091.

*Carter*, 83 F.3d at 249.

Second, and more importantly, even if Domingo *could* have introduced the Western Union checks into evidence, they were largely redundant of the evidence already presented to the jury.  Specifically, there was no dispute at trial that (1) Alimoot, Koizumi, and Cristo were the purchasers of the properties and obligated on the mortgage loans, (2) it was Alimoot, Koizumi, and Cristo's understanding that Mendoza would make mortgage payments; and (3) Mendoza did in fact make the mortgage payments.  Mendoza offers no explanation as how -- where Mendoza's payments were undisputed -- specific evidence of each mortgage payment would have forwarded his case.

Indeed, both Domingo and the government argued to the jury the relevance of Mendoza's payments, and there is no basis for the court to find that more specific evidence would have affected these arguments or the jury's decision.  For example, during his closing, Domingo argued that Mendoza was not involved in the fraudulent loan applications and instead was simply trying to help these families.  Domingo emphasized that Mendoza paid the Dano mortgages and "[t]here's no dispute as far as that goes."  Doc. No. 432, Trial Tr. at 81.  In comparison, the government argued that these payments were just part and parcel of Mendoza's scheme to obtain as much equity as possible from each property:

> As to whether or not Mr. Mendoza did intend for these
> deals to take place and to be consummated by payment
> on the mortgage and stuff, we submit to you that that
> wasn't really the case here.  The evidence doesn't support
> that.  Maybe he intended to make payments for as long as
> he needed to be able to refinance on the property, but
> once it appeared the property was struck dry, he seemed
> to stop making payments.

*Id.* at 99.  *See also id.* at 101 ("Mr. Mendoza was making payments . . . until a

refinance, a new assignee could be found or a new refinance could be done.").

     In short, there was no dispute at trial that Mendoza made the payments

as he claims in his § 2255 Motion.  From this fact the jury could infer -- if it

deemed appropriate -- that Mendoza was in fact attempting to aid these families,

which could in turn be relevant to the jury's determination of whether he defrauded

the financial institutions.  Even if the Western Union Checks could have been

admitted without Mendoza testifying, the evidence would simply be redundant.

The court therefore finds that Domingo's decision not to delve into the specifics of

each payment was a strategic choice that rests soundly within his professional

judgment.  *See Matylinsky*, 577 F.3d at 1091.

     Finally, even if Domingo should have presented the Western Union

checks, Mendoza has utterly failed to prove any prejudice.  Admission of the

mortgage payments that he did make (perhaps in some clearer fashion than as

presented at trial) would not have undermined the substantial evidence that

Mendoza engaged in a scheme to defraud several financial institutions through wire fraud, mail fraud, and money laundering, and making false statements on loan applications.  Nor do the mortgage payments negate or otherwise undermine that Mendoza received money from these transactions well in excess of the payments he did make.  In other words, Mendoza's intentions as to the homeowners was at most circumstantial evidence that was not on its own sufficient to rebut the government's case.

The court therefore DENIES Mendoza's § 2255 Motion to the extent he argues that Domingo provided ineffective assistance of counsel by failing to present evidence of the mortgage payments, or that such deficiency was in any way prejudicial.

ii.     Checks from Rosemary Dano

Mendoza asserts that the checks from Rosemary Dano, if presented into evidence, would have established that they were not intended or used for Mendoza's mortgage payments and not used to purchase a sports car as suggested by the government.  Doc No. 488, Reply at 7.  The court rejects this argument.

As initial matter, what Mendoza did with these checks is largely irrelevant and would not undermine the confidence of the verdict -- Mendoza's explanation regarding these checks does not rebut the fact that Rosemary Dano

gave Mendoza the two checks, and does not rebut the government's evidence that

the end result of the real estate transactions was that Mendoza received substantial

sums of money with each loan transaction.  Further, whatever Mendoza's

explanation as to these checks may be, Mendoza himself would have needed to

provide this explanation.  As explained above, however, Mendoza chose not to

testify.  Mendoza has therefore failed to establish that Domingo's decisions

regarding these checks were deficient or that Mendoza suffered any prejudice.

### iii.    Contracts

Finally, Mendoza argues that Domingo should have presented

evidence regarding the underlying contracts for these real estate transactions.  At

trial, however, several agreements were presented into evidence and their terms

discussed (by Alimoot and Cristo in particular).  *See* Gov't Trial Exs. 103, 171,

172.  As a result, the court cannot discern whether Mendoza asserts that Domingo

should have admitted additional contracts, or rather that Domingo failed to bring

out specific nuances of the contracts that were admitted into evidence.  Needless to

say, Mendoza's vague argument fails to carry his burden to show either that

Domingo's representation fell below professional norms or that it caused any

prejudice.  Further, like the checks, Mendoza was in the best position to testify

regarding these contracts and chose not to testify.  Mendoza has therefore failed to

establish that Domingo was ineffective by failing to present such contracts.

> e.    *Domingo's alleged failure to present IRS transcripts*

Finally, Mendoza argues that Domingo provided ineffective assistance

of counsel by failing to admit into evidence the IRS Memoranda of Interview, in

which Mendoza asserted that he was willing to pay any taxes he owed.  Doc. No.

479, Mot. at 18.  These Memoranda constitute self-serving hearsay and are

inadmissible.  As a result, Mendoza cannot base his ineffective assistance claim on

Domingo's alleged failure to admit them into evidence.  *See Cannedy*, 706 F.3d at

1163.

## B.    The Government's Use of Allegedly Altered Documents

Finally, Mendoza argues that the government engaged in prosecutorial

misconduct by (1) presenting government's trial exhibit 137 with missing

information; and (2) failing to publish the entire exhibit of government's trial

exhibit 31B.[14]  The court rejects these arguments.

Government's trial exhibit 137 is a final statement (*i.e.*, a "HUD-1")

issued by First American Title Company for the October 3, 2005 sale of the

Mokapu Property from Alimoot to Pineda.  Although Mendoza argues that the

---

[14]  Beyond his arguments regarding these exhibits, Mendoza outlines an altercation between him and the government during the deposition of Rosemary Dano.  *See* Doc. No. 479, Mot. at 19-21.  Whatever occurred, the jury was not made aware of this incident and it is therefore irrelevant to the trial.

government must have altered the exhibit because it contains only Pineda's side of the transaction and does not show Alimoot's side of the transaction establishing that Alimoot received proceeds, there is no evidence that the government altered this exhibit.  Rather, an escrow company generates three different versions of "final statements" of transactions to show the buyer's side, the seller's side, and both sides, respectively, *see* Doc. No. 485-4, Clare Connors Decl. ¶ 4, and the government simply chose to use the one showing Pineda's side of the transaction. Using this version of the HUD-1 caused no prejudice to Mendoza -- he was not charged with any crime stemming out of the Alimoot/Pineda transaction.

As to government trial exhibit 31B, a statement of income for "Theos Alms," there is no requirement that the government publish each page of an exhibit for the jury.  Rather, the exhibit was admitted into evidence and could be examined by the jury.[15]

The court therefore DENIES the § 2255 Motion to the extent it asserts that the government committed prosecutorial misconduct as to these exhibits.

---

[15] Mendoza further asserts that he did not write this document and that the income listed should have been titled "projected income," a mistake that he corrected with the document's recipient.  Doc. No. 479, Mot. at 21.  To the extent Mendoza asserts that Domingo provided ineffective assistance of counsel by failing to bring out these facts, Mendoza would have had to testify regarding these facts.

# V.  CERTIFICATE OF APPEALABILITY

In dismissing the § 2255 Motion, the court must also address whether Mendoza should be granted a certificate of appealability ("COA").  *See* R. 11 Governing § 2255 Cases in the U.S. Dist. Cts. (providing that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant").  A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

"The standard for a certificate of appealability is lenient."  *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc).  The petitioner is required to demonstrate only "that reasonable jurists could debate the district court's resolution or that the issues are adequate to deserve encouragement to proceed further."  *Id.* (citation and internal quotation marks omitted).  The standard "requires something more than the absence of frivolity but something less than a merits determination." *Id.* (internal quotation marks omitted).

The court carefully reviewed all of Mendoza's assertions and gave him every benefit by liberally construing them.  Based on the above analysis, the court finds that reasonable jurists could not find the court's rulings debatable. Accordingly, a COA is DENIED.

## VI.   <u>CONCLUSION</u>

Based on the above, the court DENIES the Petition pursuant to 28

U.S.C. § 2255 to Vacate Sentence and Set Aside for a New Sentencing, and

DENIES a certificate of appealability.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 30, 2013.



  /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. Mendoza*, Civ. No. 12-00566 JMS/BMK, Cr. No. 08-00303-01 JMS, Order:
(1) Dismissing Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct
Sentence by a Person in a Federal Custody; and (2) Denying a Certificate of Appealability